# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **JOSEPH ALVARADO, III,** | § | |
| **TDCJ No. 02287132,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **CIVIL NO. SA-23-CA-0407-JKP** |
| | § | |
| **ERIC GUERRERO,[1] Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Petitioner Joseph Alvarado, III's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 1) challenging the constitutionality of his 2019 state court murder conviction. In the § 2254 petition, Petitioner alleges the evidence was insufficient to support his conviction, the trial court erred in denying a mistrial, and that he was denied the right to effective assistance by his trial counsel. Also before the Court is Respondent Bobby Lumpkin's Answer (ECF No. 11) and Petitioner's Reply (ECF No. 15) thereto.

Having reviewed the record and pleadings submitted by both parties, the Court concludes Petitioner is not entitled to relief under the standards prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* 28 U.S.C. § 2254(d). Petitioner is also denied a certificate of appealability.

---

[1] The previous named Respondent in this action was Bobby Lumpkin. In December 2024, Eric Guerrero succeeded Lumpkin as Director of the Texas Department of Criminal Justice, Correctional Institutions Division. Under Rule 25(d) of the Federal Rules of Civil Procedure, Guerrero is automatically substituted as a party.

# I. Background

## A.    The Offense

In its opinion affirming Petitioner's conviction on direct appeal, the Texas Thirteenth Court of Appeals accurately summarized the evidence presented at Petitioner's trial:

> Tarik Ross died as a result of multiple gunshot wounds on March 7, 2018, according to William McClain, the medical examiner for Bexar County.[2] On March 15, [Petitioner] was arrested for capital murder in connection with Ross's death. Five others were also implicated: M.H.,[3] James Berg, Drevonte "Dre" King, Raeshaun Woodard, and Jayshawn Johnson.[4]

> ### The State's Case-in-Chief

> #### 1.    Erickell Willrich

> At trial, Ross's girlfriend of seven years, Erickell Willrich, testified that Ross received a phone call around 2 p.m. on March 6, 2018, from an individual she had never met named "Dre." Willrich testified she had been looking to sell her car, and "Dre told [Ross] that he had a potential car buyer." Ross and Willrich drove to the address provided by Dre after picking up their two-year-old son from daycare around 4 p.m.

> At the location, Willrich noticed a juvenile, later identified as M.H.,[5] standing outside of a white Cadillac with tinted windows. M.H. entered Willrich's vehicle through the back passenger side uninvited and immediately started "digging through [her] son's diaper bag." When Willrich confronted him, M.H. responded, "My bad," and moved his hand into his jacket, retrieving a gun. According to Willrich, the following transpired:

> > [M.H.] then he points the gun at my son's face and then points it towards me and then puts it to the back of [Ross's] head and shoved it. And then [M.H.] jumps out of the car and then runs to like the [driver's side] door and he couldn't open it . . . [A]nd then backs up and points his gun at the window like he was getting

---

[2]     McClain testified that two different sized projectiles were recovered from Ross's body. McClain opined that the projectile that came to rest inside Ross's cranial cavity appeared to be of a smaller caliber, based on the diameter of the projectile base, than the projectile recovered from Ross's right forearm.

[3]     M.H. is a juvenile. *See* Tex. R. App. P. 9.8 cmt.

[4]     At some unspecified point during the pendency of Ross's murder investigation, Johnson was murdered. No other specifics were provided at trial.

[5]     In a police lineup, Willrich identified M.H. as the shooter.

ready to open fire . . . [Ross] like looked at me and reversed—like
shifted gears and started reversing the car.  And right when the car
started moving, that's when like bullets started coming in.

Willrich said she did not initially realize Ross had been shot.  Their
vehicle collided into a fence, and Willrich leaned over to put it in park.
Neighborhood witnesses called 9-1-1.[6]  Although Willrich testified that she "saw
somebody else get out" of the Cadillac when the shooting started, she was unable
to provide a description.[7]  At some point between the car reversing and coming to
a stop, Willrich threw out Ross's backpack and other belongings.  Willrich saw
M.H. grab Ross's backpack before jumping into the passenger side of the Cadillac
and driving off.  Willrich denied knowing the contents of the backpack and stated
that while she was "aware" Ross sold marijuana, she denied that they had been
meeting anyone to sell drugs.

## 2.    Law Enforcement

Officers with the San Antonio Police Department (SAPD) and ambulatory
services arrived at approximately 4:26 p.m.  Ross was transported to a nearby
hospital, where he succumbed to his injuries the following day.  Scott Coonradt, a
crime scene investigator with SAPD, testified he located four 9-millimeter caliber
Luger spent shell casings and one .40 caliber Smith and Wesson spent shell casing
near Ross's vehicle.  Coonradt opined that the shell casings looked "pretty fresh"
and did not appear to have "any type of weathering."  SAPD Detective Lawrence
Saiz testified similarly, stating that the different casing sizes indicated two
weapons had been involved.

After learning that Ross was at the location following the direction of a
man named "Dre," Detective Saiz seized Ross's phone.  A search of Ross's phone
revealed contact information for "Dre," who was later identified as King.
Detective Saiz stated the text messages exchanged between King and Ross
indicated the two were meeting on March 6th to execute a drug transaction.

On March 14, 2018, King and Berg, the actual owner of the phone used by
King, were brought in for questioning.  Detective Saiz questioned Berg while
another detective questioned King.  Detective Saiz stated that the two men were
interviewed separately but simultaneously to better assess their credibility and
corroboration or lack-thereof.  Although Berg attempted to "distanc[e] himself

---

[6]     Ricky and Norma DeLomba testified they had just returned to their residence and were still in their vehicle
when they heard shots fired and turned to see a white Cadillac across the street.  Both witnesses testified that they
saw two shooters but could only provide a description of the shooter that had been "in the middle of the street," who
they each witnessed grab a backpack off the street before returning to the Cadillac and leaving.  The shooter they
identified matched a description of M.H.

[7]     In a body camera recording from a responding officer admitted at trial, Willrich can be heard stating she
saw "somebody else get out with like a white t-shirt."  Willrich also described the driver of the white Cadillac as a
black male but stated she "wasn't sure."

from the actual crime" for the first twenty minutes of the interview, Detective Saiz said Berg eventually provided law enforcement with information on the co-defendants, including the location of the white Cadillac. Berg was unable to identify M.H. or [Petitioner] by name but gave physical descriptions of the two men.

Using information provided by Berg during his interview, Detective Saiz executed a search warrant of Woodard's residence and secured a white two-door Cadillac parked at the residence.[8] Officers also located a backpack and several items of clothing with blood stains, including a jacket, inside a BBQ grill on the back porch. Neither M.H. nor Ross could be excluded as sources of DNA tested from the jacket and backpack. Woodard was subsequently placed under arrest and interviewed by Detective Saiz. Woodard implicated [Petitioner] in the shooting.

Detective Saiz testified that prior to interviewing Berg, King, and Woodard, SAPD received two anonymous Crime Stoppers tips naming [Petitioner] as a suspect in the shooting. The first informant stated:

> Joseph [A]lv[a]rado a 23 or 24 y[ea]r old man black and [H]ispanic. He shot a man on sw street and the man later died at university hospital[.] [H]e shot up a car with a woman and child in [the] back seat . . . I know this from Facebook and those people from crocket [sic] the trap house and that's where [Petitioner] stays at.

The informant requested that his or her identity be kept confidential because he or she feared "harass[ment]" "or even worse." The informant also disclosed that [Petitioner] sold drugs and had been physically abusive towards his girlfriend, Sarah Strickland. Several hours later, another tip was submitted: "Joseph [A]lv[a]rado shot at a 21 y[ea]r old [T]arik [R]oss on 5300 [S]herry [D]rive[.] [I]t happened at 4:30 pm a few days ago[.] I saw it on [F]acebook." This tip also included a phone number and Facebook page information for [Petitioner] and [Petitioner]'s girlfriend.

Though law enforcement never located [Petitioner]'s phone to conduct a data extraction, Detective Saiz testified that he was able to obtain and review [Petitioner]'s cell phone records from his phone provider. The records indicated [Petitioner] was in frequent communication with Johnson immediately before and after the shooting.[9] [Petitioner]'s phone was also in the same "coverage area" as the crime scene during the time of the murder.

---

[8]    Although Ross's vehicle and the Cadillac were both "processed" for fingerprints, there were no returned matches for any of the co-defendants in this case.

[9]    There were calls placed from [Petitioner] to Johnson at 4:00 p.m. (12 seconds), 4:08 p.m. (9 seconds), 4:17 p.m. (62 seconds); 4:19 p.m. (27 seconds), 4:22 p.m. (17 seconds), 4:25 p.m. (35 seconds), and 4:26 p.m. (3

### 3.    Co-Defendants Berg and King

At trial, Berg testified that he and King had sustained non-life-threatening gunshot wounds during an unrelated shooting a few days after Ross's murder. Berg believed he was going to be speaking to law enforcement as a complainant, not suspect, when he agreed to meet with police.

Berg testified that in March 2018 he had been living with King in a small "barn" behind a trailer. Berg had lent his phone to King to contact Ross on March 5th and March 6th, the day of the shooting. According to Berg, Ross was a "plug," "someone who you can get drugs from on a regular basis." Berg believed the contact was for the purchase of marijuana, and he only learned "afterwards" about the plan to rob Ross. Berg said M.H., Berg, Woodard, Johnson, and [Petitioner] were "all in on the plan" and present at the barn when the discussion took place on March 5. The plan was to lure Ross to a random location a few streets away from the barn and rob him.

Berg testified that on March 6, all six men gathered at the barn before the robbery. Woodard drove the white two-door Cadillac, Johnson sat in the front passenger seat, and M.H. and [Petitioner] sat in the back. Berg stayed behind at the barn with King. Approximately ten to fifteen minutes later, Berg heard "five or six" gun shots. While Berg never saw Woodard or M.H. again, Berg said Johnson returned to the barn later and threatened him to "keep [his] mouth shut or else."

Berg testified that after he was arrested, he was placed in a booking cell along with fifteen to twenty other individuals, including [Petitioner].[10] [Petitioner] purportedly told Berg that he had exited the Cadillac after M.H. Berg testified that [Petitioner] said:

> Hey, I just want you to know that all I really did was—I messed up. I was at the window, and [Ross] ended up throwing the car in reverse. And everybody got scared, and [M.H.] shot. And then I tripped[,] and I fell and I shot the bottom of the car.

Woodard also testified at trial.[11] He stated Johnson had contacted him concerning "a play," "some way to get money." Woodard knew Johnson from a

---

minutes). For the next hour, there were "seven calls back and forth," testified Mark Sedwick, special agent with the Federal Bureau of Investigations.

[10]    Lieutenant Charles Cagle with the Bexar County Sheriff's Office testified Berg was booked on March 16 at 11:02 a.m., and [Petitioner] had been booked earlier that morning at 8:18 a.m. Although Cagle was unable to confirm whether the two shared a cell, Cagle testified that there were only two cells used to house all inmates during the booking process and the booking process takes "[a]nywhere from 8 to 12 hours."

[11]    In exchange for Woodard's testimony, the State entered into a plea bargain agreement with Woodard for a twenty-year sentence for the lesser included offense of murder.

prior "play"; the two were convicted for burglary of a habitation in 2017. Woodard said he met with Johnson, M.H., Berg, King, and [Petitioner] at the barn.  Woodard identified everyone's role in the robbery: Johnson supplied the weapons; King communicated with Ross, using Berg's phone, to draw Ross to the location; M.H. was "the one to actually rob [Ross]"; [Petitioner] was "backup"; and Woodard drove.

Woodard testified that on the day of the shooting, [Petitioner] and M.H. carried guns, a "Glock 27" and a "Glock 19," respectively.  Woodard drove M.H. and [Petitioner] to the location.  After Ross arrived, Woodard watched M.H. enter Ross's vehicle on the back passenger side.  "About five minutes after that," Woodard saw Ross try to "pull off," and that is when [Petitioner] exited the Cadillac.  Woodard said [Petitioner] was situated "to the front" of Ross's vehicle, while M.H. was "at the back of the car."  After M.H. and [Petitioner] shot at Ross's vehicle, Woodard witnessed a bag get thrown out of the vehicle while it was rolling in reverse.  He said the bag was picked up by M.H.  [Petitioner] and M.H. returned to the Cadillac, and Woodard then drove them to his residence, where Johnson was waiting.

### 4.    Jailhouse Informant

Jailen Collins testified concerning his connection to several of the parties involved in this cause.[12]  Collins, however, first met [Petitioner] while the two were incarcerated at the county jail.  Collins testified that during their discussions, [Petitioner] admitted to him that they had "set [Ross] up."  "[Petitioner] said that he got out the car because it was, I guess, taking a minute and he pulled—he tapped on the window with the gun and told [Ross] to give up the stuff," testified Collins.  After Ross "tried to pull off," [Petitioner] said he and M.H. started shooting.  Collins testified that [Petitioner] told him Ross was shot in the head.

Collins testified that he wrote to [Petitioner] after he posted bond, and [Petitioner] wrote back to him.  [Petitioner]'s letter to Collins was admitted at trial:

---

[12]    Collins stated he reached out to King "asking him to help . . . find some weed" in Spring 2018.  In the early morning hours of March 6, 2018, King introduced Collins to Ross, and Collins "bought a pound of weed off of [Ross]."  The transaction occurred in the backseat of Ross's vehicle shortly after midnight.  Collins said Willrich and the child were present.  Collins testified he then "went back with [King] to [King's] house and smoked."  Collins and King discussed selling some of the marijuana Collins had just purchased, and King agreed to find a buyer.  Around 6 p.m. on March 6, King contacted Collins and provided him with an address.  Collins testified King and M.H. were waiting together at the location, and M.H. was behaving strangely.  Shortly after they entered the property through a side gate, M.H. pulled out a gun and pointed it at Collins, instructing him to get on the ground. Collins complied, and M.H. took his backpack, which contained the marijuana.  According to Collins, King said, "F[-]ck this" and ran out.  Collins felt King had "set [him] up" to get robbed, prompting Collins to confront King at the barn later.  Collins testified that he did not know who Berg was and that Berg had been shot inadvertently.

Prior to trial, Collins was charged with aggravated assault with a deadly weapon for shooting King and Berg. Collins pleaded guilty to the lesser-included offense of deadly conduct with a firearm. In exchange for his testimony at appellant's trial, the State agreed to enter into a deferred adjudication plea bargain agreement.

Jailen, here what's good, bro?  Sorry it took so long for me to write back . . . I [sic] been in here tripping.  I go to trial on May the 20th, in 7 days, [and] [King] is coming to testify against me.

Look, bro, the reason I almost didn't write you back is because I likely feel like you're being selfish.  You're facing a petty ass aggravated assault, [and] they're offering to cap it at 8.  Do you know how fast I'd sign on that?  The cold part is, you don't even have to take that if you'd just be honest [and] say what really happened.  Hell yes [King] [is] taking the stand on you, and he's taking the stand on me too.  What you did to him will be considered retaliation, [and] that's not an aggravated charge.  They'll use you to testify on [King and Berg and] give you a low number.  Thats what you need to do.

Now, I'm helping you out by giving you the information you need, so now I need you to help me out.  [King] is coming to take the stand on me [and] implicate me in a murder, as well as [M.H., Berg, and Woodard].  Fam, there's no way I'd get convicted without these niggahs [sic] taking the stand, so I'll need you to testify against their testimony.  They're about to lie [and] act like they ain't know [and] like they had no idea of what was gonna happen, but like you told me, they had you buy from [Ross] the night before, then robbed you the next day at [Woodard's] house.  You saw exactly who robbed you [and] those same two people killed [Ross].  That's what I need you for.  Fam, they're tryna [sic] send me away for the rest of my life so f[-]ck these niggahs [sic]!

. . .

If you don't show up to testify, I'll have no choice but to say what you told me about [King, Berg, and M.H.] to my attorney, who will put [Ross's] b[aby] m[omma] on the stand to confirm, so you may as well do it.  Cuz [sic] if you do that, they can't testify against you!!  So Imma [sic] have you subpoena[e]d to court[.]  Just do the right thing fam.  Ain[']t no way neither one of us should go down for this shit.  [Illegible] got no evidence on either of us but the statements against us.  You hold the key lil niggah [sic].  Tell [illegible] to write me, [illegible] got his info anymore.

Collins said he viewed the letter as a threat.  "It made me feel that he was basically telling me if I didn't try to get him out of the situation that he was going to in a way blackmail me," explained Collins.

5.    **Sarah Strickland**

Strickland testified that she had just given birth to [Petitioner]'s child and was still in the hospital when [Petitioner] was apprehended in March 2018. [Petitioner] later asked her to write an affidavit declaring that he was with her on March 6. Strickland declined. Strickland stated [Petitioner] had written her several letters while he was incarcerated even after the two separated. One letter written by [Petitioner] to Strickland was admitted at trial:

> . . . I found out your mom is the reason I'm here. But see, your mom should've never even known what happened in this case, not even a street name, cuz [sic] she didn't have cable to watch the news! So that leaves one person. I sure as hell don't talk to Stephanie about my criminal activities or any of my friend's criminal activities. But you know I speak of everything to you.
>
> I've always said you talk too much; it's your problem. Now look, I'm in here facing a life sentence because of you [and] ya [sic] mamma [and] you wanna [sic] feed me some lame ass excuse about being scared to go to jail? F[-]ck what my lawyer told you. What did I tell you? My lawyers fixin[g] get fired anyway. You always listen to what everybody else gotta say doe [sic]. Oh but "I got [child] to think about," but I can't say that cuz [sic] you took that privilege away from me by opening your mouth. And the way it seems to me, you've already given up hope on me. Instead of being here emotionally[,] you say, "I'll never talk to you again if you get life," [laughing my ass off], the way you're so insistent on me signing over a 20; I really feel like you are hiding something. Are you afraid of me Sarah? What did you do that you're so afraid of me for? [Laugh out loud], no worries. I'll find out.
>
>                                    . . .
>
> Your only redeeming factor is you writing the affidavit for me. [T]hat's the only way I'll ever get back with you. You can't get charged for writing an affidavit either. But that's the only alibi I have is being with you [and] if you ain[']t tryna [sic] say that no more, but you'd rather let me go to prison for life? Then f[-]ck you. I'll never get back with you [and] that's on all my dead relatives and on both my children's souls. God can strike me now if I'm lying, but Sarah, if you gonna be on this b.s., [inelible] need you, you ain[']t the only one.

*Alvarado v. State*, No. 13-20-00070-CR, 2021 WL 2371524, at *1-6 (Tex. App.—Corpus

Christi-Edinburg, June 10, 2021, pet. ref'd); (ECF No. 12-30 at 2-10).

**B.**    **Procedural History**

After hearing all of the evidence, a Bexar County jury convicted Petitioner of the lesser included offense of felony murder. *State v. Alvarado*, No. 2018CR5570D (290th Dist. Ct., Bexar Cnty., Tex. Oct. 1, 2019); (ECF No. 12-1 at 234-35).  Following a separate punishment hearing, the trial court sentenced Petitioner to sixty-five years of imprisonment as a habitual offender. *Id*. The Texas Thirteenth Court of Appeals affirmed his conviction on direct appeal. *Alvarado*, 2021 WL 23715242020; (ECF No. 12-30).  The Texas Court of Criminal Appeals then refused his petition for discretionary review. *Alvarado v. State*, No. 0549-21 (Tex. Crim. App. Oct. 27, 2021); (ECF No. 12-34).

Thereafter, Petitioner challenged the constitutionality of his conviction by filing an application for state habeas corpus relief. *Ex parte Alvarado*, No. 93,951-02 (Tex. Crim. App.); (ECF No. 12-47 at 4-22).  Based, in part, on the findings of the state habeas trial court, the Texas Court of Criminal Appeals eventually denied the application without written order on December 21, 2022.  (ECF No. 12-52).

Two months later, Petitioner initiated the instant proceedings by filing a petition for federal habeas corpus relief.  (ECF No. 1).  In the petition and supplemental memorandum filed with it, Petitioner raises the following allegations:  (1) the evidence was insufficient to support the conviction, (2) his constitutional right to a fair trial was violated when, during deliberations, the jury viewed a video that was not admitted into evidence, (3) his trial counsel rendered ineffective assistance before and during trial, and (4) the trial court abused its discretion by denying a mistrial and instead instructing jurors to disregard the video they were erroneously provided during deliberations. *Id*.

## II. <u>Standard of Review</u>

Petitioner's federal habeas petition is governed by the heightened standard of review provided by the AEDPA. 28 U.S.C.A. § 2254. Under § 2254(d), a petitioner may not obtain federal habeas corpus relief on any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005). This intentionally difficult standard stops just short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citing *Felker v. Turpin*, 518 U.S. 651, 664 (1996)).

A federal habeas court's inquiry into unreasonableness should always be objective rather than subjective, with a focus on whether the state court's application of clearly established federal law was "objectively unreasonable" and not whether it was incorrect or erroneous. *McDaniel v. Brown*, 558 U.S. 120 (2010); *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable, regardless of whether the federal habeas court would have reached a different conclusion itself. *Richter*, 562 U.S. at 102. Instead, a petitioner must show that the decision was objectively unreasonable, which is a "substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003).

So long as "fairminded jurists could disagree" on the correctness of the state court's decision, a state court's determination that a claim lacks merit precludes federal habeas relief.

*Richter*, 562 U.S. at 101 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  In other words, to obtain federal habeas relief on a claim previously adjudicated on the merits in state court, Petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id*. at 103; *see also Bobby v. Dixon*, 565 U.S. 23, 24 (2011).

### III.  Analysis

### A.        Sufficiency of the Evidence **(Claim 1)**

Petitioner first contends the evidence was insufficient to support his felony murder conviction.  According to Petitioner, the State failed to provide incriminating evidence, instead relying on the uncorroborated testimony of two accomplices, Woodard and Berg, and the testimony of three eyewitness, Willrich and the Delombas, none of whom identified Petitioner as the shooter.   This allegation was raised and rejected during Petitioner's direct appeal proceedings.  As discussed below, Petitioner fails to demonstrate the state court's rejection of the allegation was contrary to, or an unreasonable application of, Supreme Court precedent.

#### 1.       The *Jackson* Standard

In *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), the Supreme Court enunciated the standard of review when a state prisoner challenges the sufficiency of the evidence in a federal habeas corpus proceeding.  The Court stated the issue to be "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id*.  In applying this standard*,* the Court went on to say that "[t]his familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Id*.  Thus, all credibility choices and conflicts in

inferences are to be resolved in favor of the verdict. *United States v. Resio-Trejo,* 45 F.3d 907, 911 (5th Cir. 1995); *United States v. Nguyen,* 28 F.3d 477, 480 (5th Cir. 1994).

In addition, the AEDPA imposes a "twice-deferential standard" when a federal court reviews a state prisoner's claim challenging the sufficiency of the evidence. *Parker v. Matthews*, 567 U.S. 37, 43 (2012). As the Supreme Court has explained:

> The opinion of the Court in *Jackson v. Virginia* . . . makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

*Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (citations omitted).

    2.    <u>Applying the *Jackson* Standard</u>

Petitioner raised his insufficient evidence claim during his direct appeal proceedings, but the Texas Court of Criminal Appeals refused Petitioner's petition for discretionary review without written order. Thus, this Court "should 'look through' the unexplained decision to the last related state-court decision" providing particular reasons, both legal and factual, "presume that the unexplained decision adopted the same reasoning," and give appropriate deference to that decision. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018); *Wooten v. Lumpkin*, 113 F.4th 560, 566 (5th Cir. 2024). In other words, the Court must look to the last reasoned state judgment that considered and rejected Petitioner's insufficient evidence claim when reviewing the claim under the deferential standard set forth in *Jackson. See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

In this case, the last reasoned state court decision was issued by the Texas Thirteenth Court of Appeals, which concluded that there was sufficient evidence to support Petitioner's conviction:

**B.    Analysis**

[Petitioner] principally contends that the evidence was legally insufficient to convict him of felony murder because (1) the testimony from Woodard and Berg, his co-defendants, was uncorroborated; (2) Willrich and witnesses "only ever saw a single shooter"; (3) [Petitioner]'s letter to Strickland was "at best, silent about the instant offense"; (4) [Petitioner]'s DNA and fingerprints were not recovered from either of the vehicles; and (5) any testimony regarding a second shooter could have been a reference to Woodard or Johnson.

The non-accomplice and non-jail informant evidence in this case shows the following:

- Based on the autopsy findings and shell casings found at the scene, Ross was shot by two different weapons. While none of the witnesses were able to provide a description of the second shooter, Willrich and the DeLombas both confirmed the presence of a second shooter.

- [Petitioner]'s phone was at or near the scene of the murder around the time of the murder, and [Petitioner]'s phone made over a dozen calls to a co-defendant shortly before and after the shooting.

- Two anonymous tips submitted through Crime Stoppers alleged [Petitioner]'s involvement in the shooting; the latter tip provided identifying information for [Petitioner].

- In a written letter, [Petitioner] sought an alibi from his ex-girlfriend. [Petitioner] suggested he had been involved in illicit activity in connection with this cause—matters which he had confided in Strickland, who told her mother, who then contacted law enforcement, resulting in his arrest:

    I sure as hell don't talk to Stephanie about my criminal activities or any of my friend's criminal activities. But you know I speak of everything to you . . . I've always said you talk too much; it's your problem. Now look, I'm in here facing a life sentence because of you [and] ya [sic] mamma.

- [Petitioner] also wrote to Collins, requesting that Collins testify favorably, or [Petitioner] would "have no choice but to" disclose what Collins had told him concerning Collin's aggravated assault offense. Although [Petitioner], in his letter to Collins, states that "those same two people killed [Ross]," presumably in reference to King and M.H. robbing Collins, [Petitioner] insinuates his own involvement and his co-defendant's feigned ignorance: "They're about to lie [and] act like they ain't know [and] like they had no idea of what was gonna happen . . ."

On review, we defer to the jury's view of the facts and do not engage in a "divide and conquer" approach. *See* [*Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011)]. The corroborating circumstantial evidence here "link[s] the accused in some way to the commission of the crime." *See* [*Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008)]; *see, e.g., De La Fuente v. State*, 432 S.W.3d 415, 421-22 (Tex. App.—San Antonio 2014, pet. ref'd) (holding non-accomplice witness evidence that placed defendant at or near the scene of the murder, close in time to its commission, and in the company of a person charged as an accomplice to the murder was sufficient to corroborate accomplice-witness testimony). And, as such, it constitutes sufficient corroborating evidence to connect [Petitioner] to the commission of Ross's robbery and murder. *See* Tex. Code Crim. Proc. Ann. arts. 38.14, 38.075. Further, in considering all the evidence presented to the jury, including the accomplice-witness and jailhouse-informant evidence, there is more than sufficient evidence to conclude that the State proved beyond a reasonable doubt that [Petitioner], acting alone or together as a party, intentionally or knowingly committed or attempted to commit a robbery, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, committed or attempted to commit an act clearly dangerous to human life that caused the death of Ross. *See* [*Phillips v. State*, 463 S.W.3d 59, 66 (Tex. Crim. App. 2015)]; Tex. Penal Code Ann. §§ 19.02(b)(3), 29.02. Thus, we hold the evidence is legally sufficient to support [Petitioner]'s conviction. We overrule [Petitioner]'s first issue.

*Alvarado*, 2021 WL 2371524, at *8-9; (ECF No. 12-30 at 15-17).

Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, federal law, or that it was an unreasonable determination of the facts based on the evidence in the record. Again, a state appellate court's determination is entitled to great deference when, as was done in this case, the court conducted a thorough and thoughtful review of the evidence. *Callins v. Collins*, 998 F.2d 269, 276 (5th Cir. 1993). As with the state appellate court, this Court has independently reviewed the record and finds the evidence sufficient to support the verdict. Thus, viewing all of the evidence under the doubly deferential standard that applies on federal habeas review, Petitioner has not shown that the state court's decision was objectively unreasonable or that he is entitled to relief under *Jackson*. Federal habeas relief is therefore denied.

**B.**     <u>**Jury Deliberations**</u> **(Claims 2, 4)**

Petitioner next contends he was denied a fair trial when the jury, while deliberating after

the guilt/innocence phase of trial, viewed part of a police interrogation video that was not

admitted into evidence at trial.  Because he was in handcuffs and giving a statement to police in

the video, Petitioner asserts his due process rights under the Fourteenth Amendment, his

presumption of innocence, and rights against self-incrimination and to confront witnesses, were

violated.  He also argues that the trial court abused its discretion by denying a mistrial and

instead instructing jurors to simply disregard the video.

Each of these allegations, in various forms, were raised and rejected during Petitioner's

direct appeal and state habeas proceedings.  As discussed below, Petitioner fails to demonstrate

that these determinations were objectively unreasonable.[13]

1.     <u>Relevant Facts</u>

In its unpublished opinion on direct appeal, the Texas Thirteenth Court of Appeals

accurately summarized the relevant facts concerning these allegations:

> During jury deliberations, the jury released a note, which stated: "State's
> Exhibit No. 1 is an interview of the Defendant on 3/15/18.  This, to our
> knowledge, was not shown at trial.  Are we allowed to watch this DVD?"  The
> State requested that the trial court send an instruction stating that the jury was
> only to consider the evidence admitted at trial.  Defense counsel moved for a
> mistrial.  The trial court notified the attorneys that it would be sending a response
> to the jury to inquire as to whether they had viewed the State's Exhibit.
> Following a brief recess, the trial court resumed on the record:
>
> > THE COURT:          Okay.  The response to the question was,
> >                              ["]We turned the video on, and we then saw
> >                              the Defendant walk into the interrogation

---

[13]     In his answer, Respondent contends that all of Petitioner's constitutional claims regarding the video—i.e., every claim other than the abuse of discretion allegation—are procedurally barred from federal habeas review because Petitioner raised them for the first time in his petition for discretionary review.  (ECF No. 11 at 32-38).  Because all of Petitioner's allegations are without merit, the Court will not address this argument.  See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

room.  We then paused the video.  We paused the video prior to questions being asked or the Defendant speaking.  We realized that we hadn't seen the video before.  We then subsequently asked the question.  The Defendant had not sat down in the video before we paused it,["] signed the jury foreman.

[PETITIONER]:    Based on that response, Judge, I would reurge my motion for a mistrial.  Not only have they gotten evidence that was never admitted in this trial but they have seen my client on the video knowing that he gave [a] statement, likely in handcuffs.  And it would—I mean, it would unduly prejudice him.  They have a piece of evidence that was never admitted, never even alluded to in the trial.  So, we'd ask for a mistrial.  There's no way to cure that.  We can't send them a note back telling them to ignore that, ignore that, you know, that he gave a statement, and ignore what you saw.  We can't unring that bell.

The trial court prepared and submitted a written response, instructing the jury to "disregard" anything "gleaned or determined from State's Exhibit 1" and to continue deliberations.  [Petitioner]'s trial counsel objected to "any curative instruction" and requested a mistrial, which was promptly denied.

*Alvarado*, 2021 WL 2371524, at *6; (ECF No. 12-30 at 11).

2.    Analysis

Despite being raised as separate allegations, both of Petitioner's claims essentially argue the same thing—the trial court abused its discretion in denying his motion for mistrial because the jury's viewing of the video violated his constitutional rights.  But under both State and federal law, the decision to grant or deny a motion for a mistrial is left to the sound discretion of the trial judge.  *See United States v. Honer*, 225 F.3d 549, 555 (5th Cir. 2000); *Jenkins v. State*, 493 S.W.3d 583, 612 (Tex. Crim. App. 2016).  With that discretion, a trial court's denial of the request for a mistrial justifies federal habeas relief only if it was an "error . . . so extreme that it

16

constitutes a denial of fundamental fairness under the Due Process Clause." *Bridge v. Lynaugh*, 838 F.2d 770, 772 (5th Cir. 1988).

Petitioner has failed to demonstrate that the trial court erred or that the alleged error rendered his trial fundamentally unfair. Under Texas law, a mistrial is appropriate only when the objectionable event "is so inflammatory that a curative instruction is not likely to prevent a jury from being unfairly prejudiced against a defendant." *Thompson v. State,* 89 S.W.3d 843, 851 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). Here, the intermediate court of appeals explained that the jury only viewed a brief portion of the video before seeking guidance from the trial court. *Alvarado*, 2021 WL 2371524, at *9-10; (ECF No. 12-30 at 18-19). The jury did not hear anyone speak and paused the video once they realized it was something they haven't seen before. *Id*. As such, the appellate court correctly found that the trial court's immediate instruction to disregard the video cured any potential error regarding the jury's brief viewing. Indeed, the jury is presumed to have followed the trial court's instructions not to consider such evidence. *See Galvan v. Cockrell,* 293 F.3d 760, 766 (5th Cir. 2002). Because Petitioner presents no probative evidence rebutting this presumption, and none appears in the record, he fails to show that the trial court's ruling denied him a fundamentally fair trial.

Even assuming the trial court committed such an extreme constitutional error in denying a mistrial, Petitioner still fails to demonstrate that the erroneous decision had a "substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Pliler,* 551 U.S. 112, 116 (2007) (citing *Brecht v. Abrahamson,* 507 U.S. 619, 631 (1993)); *Barrientes v. Johnson,* 221 F.3d 741, 756 (5th Cir. 2000). Under this standard, a petitioner may obtain habeas relief only if there is "more than a mere reasonable possibility that [the error] contributed to the verdict." *Burbank v. Cain,* 535 F.3d 350, 358 (5th Cir. 2008) (citations omitted). Petitioner does not make

this showing, as the jury indicated they only saw a brief portion of the video where Petitioner walked into the interrogation room—they never heard Petitioner speak or anyone ask him questions.  Even so, the trial court appropriately took steps to minimize any risk of prejudice by admonishing the jury to disregard anything they saw and to only consider evidence that had been admitted at trial.  While Petitioner points out that the jury did see Petitioner in handcuffs in the video, such would have little effect on the jury given there was other evidence before the jury that Petitioner had been arrested on that day.  (ECF No. 12-14 at 92).

Regardless, the overwhelming evidence presented by the State was sufficient to render harmless any error in the trial court's denial of a mistrial.  *Hatten v. Quarterman*, 570 F.3d 595, 604 (5th Cir. 2009).  As discussed previously, Petitioner was identified as a shooter in this case by two of his accomplices, Woodard and Berg, as well as a jailhouse informant, Collins.  *See* Section I(A), *supra*.  Their testimony was corroborated by cell phone evidence, CrimeStoppers tips, and letters written by Petitioner himself, in addition to eyewitness testimony and ballistics evidence indicating that there was more than one shooter.  *Id*.  Thus, given the overwhelming nature of the evidence presented by the State establishing Petitioner's guilt, Petitioner fails to establish that the jury's brief viewing of a video showing him in restraints following his arrest had a "substantial and injurious effect or influence" on the jury's ultimate decision.  *Fry*, 551 U.S. at 121-22.

In sum, Petitioner fails to show that the state court's determination is in conflict with established federal law or is objectively unreasonable.  He also fails to rebut the presumption of factual correctness with clear and convincing evidence.  As such, federal habeas relief is unwarranted.

**C.**   **Trial Counsel** (Claim 3)

In his third claim for relief, Petitioner argues he was denied the right to effective assistance of counsel by his attorney at trial, David Woodard.  Specifically, Petitioner contends that counsel failed to: (a) conduct a mental examination of Petitioner, (b) conduct any independent investigation that would support Petitioner's innocence, (c) object to misleading and prejudicial evidence, (d) discover and present any mitigating evidence, and (e) provide attorney/client files and documents necessary for an appeal to challenge a factually incorrect warrant.   The first four of these allegations were raised during Petitioner's state habeas proceedings and rejected by the Texas Court of Criminal Appeals.   As discussed below, Petitioner fails to demonstrate the state court's rejection of the allegations was either contrary to, or an unreasonable application of, Supreme Court precedent.

1.   The *Strickland* Standard

Sixth Amendment claims concerning the alleged ineffective assistance of trial counsel (IATC claims) are reviewed under the familiar two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984).   Under *Strickland*, a petitioner cannot establish a violation of his Sixth Amendment right to counsel unless he demonstrates (1) counsel's performance was deficient and (2) this deficiency prejudiced his defense.   466 U.S. at 687-88, 690.   According to the Supreme Court, "[s]urmounting *Strickland*'s high bar is never an easy task."   *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

When determining whether counsel performed deficiently, courts "must be highly deferential" to counsel's conduct, and a petitioner must show that counsel's performance fell beyond the bounds of prevailing objective professional standards.   *Strickland,* 466 U.S. at 687-89.   Counsel is "strongly presumed to have rendered adequate assistance and made all significant

decisions in the exercise of reasonable professional judgment." *Burt v. Titlow*, 571 U.S. 12, 22 (2013) (quoting *Strickland*, 466 U.S. at 690). To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Under this prong, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. A habeas petitioner has the burden of proving both prongs of the *Strickland* test. *Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

Finally, IATC claims are considered mixed questions of law and fact and are analyzed under the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *See Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010). Where, as here, the state court adjudicated the IATC claims on the merits, a court must review a petitioner's claims under the "doubly deferential" standards of both *Strickland* and Section 2254(d). *See Woods v. Etherton*, 578 U.S. 113, 117 (2016) (citing *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)); *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009). In such cases, the "pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standards," but whether "the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S at 101. That is to say, the question to be asked in this case is not whether counsel's actions were reasonable, but whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. at 105.

2.    Petitioner's Mental Health

It is well established that an incompetent person cannot lawfully be put on trial. *Thomas v. Lumpkin*, 995 F.3d 432, 451 (5th Cir. 2021) (citing *Drope v. Missouri*, 420 U.S. 162, 171 (1975)). The Supreme Court has explained that the two-part test for competence is (1) whether a defendant has "a rational as well as factual understanding of the proceedings against him;" and

(2) whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Indiana v. Edwards*, 554 U.S. 164, 170 (2008) (citing *Dusky v. United States*, 362 U.S. 402 (1960)). "[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required." *Drope*, 420 U.S. at 180; *United States v. Flores-Martinez*, 677 F.3d 699, 706-07 (5th Cir. 2012).

Petitioner first contends that he was denied effective assistance by his trial counsel's failure to request a mental examination prior to the guilt/innocence phase of trial. Had counsel conducted a proper investigation into his mental health, Petitioner argues, he would have discovered that Petitioner (1) had been institutionalized several times, (2) was placed in special education classes during school, (3) regularly saw a psychiatrist who prescribed numerous anti-psychotic and anti-depressive medications, and (4) was medicated at the time of trial. For these reasons, Petitioner asserts that he was incompetent and did not understand the proceedings against him. He also contends that counsel could have used the results of a mental examination to impeach the credibility of his alleged confession to Jailen Collins, the jailhouse informant, or challenge its admissibility.

Petitioner raised these allegations during his state habeas proceedings. In response, trial counsel submitted an affidavit wherein he addressed Petitioner's assertion:

> [Petitioner] was always engaged in his defense. I have attached a Rejection of Plea Agreement (Exhibit A) that [Petitioner] signed in which he rejected a plea of thirty (30) years for Murder against my legal advice. At no time during the representation of [Petitioner] did he state he did not understand the proceedings against him, nor did he ever inform me he was taking medication that was inhibit[ing] his mental capacity. I spoke with his grandmother regarding any mental health concerns that [Petitioner] may have dealt with growing up. I was only provided that he would act out at school and suffered from ADHD.

(ECF No. 12-50 at 40).

The state habeas trial court found trial counsel's affidavit to be truthful and credible and concluded that Petitioner failed to prove that counsel was ineffective under the *Strickland* standard. *Id*. at 42-48. These findings and conclusions were adopted by the Texas Court of Criminal Appeals when it denied Petitioner's state habeas application. (ECF No. 12-52). These determinations, including the trial court's credibility findings, are entitled to a presumption of correctness unless they lack fair support in the record. *Demosthenes v. Baal*, 495 U.S. 731, 735 (1990); *Miller v. Thaler*, 714 F.3d 897, 903 (5th Cir. 2013).

Petitioner fails to show that the state court's ruling on counsel's performance was contrary to, or involved an unreasonable application of *Strickland* or that it was an unreasonable determination of the facts based on the evidence in the record. *Strickland* requires counsel to undertake a reasonable investigation, particularly where a defendant has a history of mental illness. 466 U.S. at 690-91; *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990). Counsel must, at minimum, interview potential witnesses and make an independent investigation of the facts and circumstances of the case. *Kately v. Cain*, 704 F.3d 356, 361 (5th Cir. 2013). But in assessing the reasonableness of counsel's investigation, a heavy measure of deference is applied to counsel's judgments and is weighed in light of the defendant's own statements and actions. *Strickland*, 466 U.S. at 691. This Court is also prohibited from evaluating defense counsel's choices through the "distorting lens of hindsight." *Id*. at 689.

In this case, counsel conceded during closing argument at the punishment phase that Petitioner "does have some mental issues" such as ADHD, bipolar disorder and a sleep disorder, and expressed awareness that Petitioner was in special education classes while in school. (ECF No. 12-15 at 23-24). Despite this past, counsel did not have Petitioner evaluated because he was always engaged in his defense and never mentioned to counsel that he was taking medications

that would inhibit his mental capacity.  In other words, there was no reason to question whether Petitioner understood the proceedings against him or had a reasonable ability to consult with counsel.

Furthermore, even assuming Petitioner suffered from certain mental health issues at the time he was represented by counsel, such issues do not necessarily raise an objective doubt as to his competency.  *See Mays v. Stephens*, 757 F.3d 211, 216 (5th Cir. 2014) (finding a defendant "can be both mentally ill and competent to stand trial").  Indeed, "the presence or absence of mental illness or brain disorder is not dispositive" as to competency.  *United States v. Mitchell*, 709 F.3d 436, 440 (5th Cir. 2013) (citing *Mata v. Johnson*, 210 F.3d 324, 329 n.2 (5th Cir. 2000)); *see also Walton v. Angelone*, 321 F.3d 442, 460 (4th Cir. 2003) ("Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges.") (citation omitted).

As explained by counsel's affidavit—which was adopted by the state habeas court and ultimately by the Texas Court of Criminal Appeals—Petitioner's mental illness did not interfere with his understanding of the proceedings or his ability to assist in his defense.  Petitioner has provided no evidence to the contrary, much less demonstrated that the state court's ruling on trial counsel's investigation and performance "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Richter*, 562 U.S. at 103.  Consequently, viewing this allegation under the "doubly" deferential standard that applies on federal habeas review, Petitioner has not shown that the state court's decision was objectively unreasonable or that he is entitled to relief on this IATC claim.

3.     Failure to Investigate

Petitioner next alleges that counsel was ineffective for failing to conduct any investigation to support his alibi defense that he was not present when the shooting occurred. Evidence was presented at trial that a cell phone linked to Petitioner was located in the same "coverage area" as the crime scene during the time of the murder.  Had counsel properly investigated, Petitioner argues, he would have discovered that the cell phone actually owned by Petitioner was miles away from the crime scene at the time of the murder.

Petitioner does not provide any argument or evidence establishing ownership of a different cell phone than the one linking him to the crime scene, much less that this other phone would have placed him someplace else at the time of the crime.  Under Rule 2(c) of the Rules Governing Section 2254 Cases, however, a petitioner is required to plead facts in support of his claims.  Conclusory allegations do not state a claim for federal habeas corpus relief and are subject to summary dismissal.  *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) (holding "mere conclusory allegations do not raise a constitutional issue in a habeas proceeding"); *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990) (same).

Here, Petitioner's allegation is conclusory, speculative, and unsupported by any evidence or facts.  But "absent evidence in the record," this Court cannot "consider a habeas petitioner's bald assertions on a critical issue in his pro se petition . . ., unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value."  *Ford v. Davis*, 910 F.3d 232, 235 (5th Cir. 2018) (citing *Ross*, 694 F.2d at 1011).  For this reason alone, Petitioner's claim could be denied.  *See United States v. Demik*, 489 F.3d 644, 646 (5th Cir. 2007) ("[C]onclusory allegations are insufficient to raise cognizable claims of ineffective assistance of counsel.") (quoting *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000)).

Nevertheless, Petitioner's IATC allegation is meritless.  As with the previous allegation, trial counsel responded to Petitioner's assertion in his affidavit to the state habeas trial court:

> A co-defendant that testified at trial placed [Petitioner] at the scene as a shooter.  After the incident [Petitioner] was with the co-defendants in a vehicle that returned back to the initial house where the plot to rob the victim had begun. Later that same day, [Petitioner] was again with the co-defendants in an attempt to commit another robbery.  [Petitioner] never provided me with an alibi of his location of where he could have been.  At one point, he informed me that he was with the co-defendant prior to the murder, but asked to get out of the car. According to him, the co-defendants then committed the murder, and picked him back up.  This explanation was presented to the jury and the jury did not believe this theory as they say by their verdict.  I contacted the girlfriend to ask if [Petitioner] could have possibly been with her at the time of the murder and she said no.  Aside from the girlfriend, I was not provided any other evidence from [Petitioner] that I could investigate that would show that he was not present at the murder.

(ECF No. 12-50 at 39-40).  The state habeas trial court found trial counsel's affidavit credible and concluded that Petitioner failed to established the deficiency prong of the *Strickland* analysis.  *Id.* at 54-56.  These findings and conclusions were then adopted by the Texas Court of Criminal Appeals.  (ECF No. 12-52).

Petitioner fails to show that the state court's ruling on trial counsel's performance was unreasonable.  *Strickland* requires counsel to undertake a reasonable investigation.  466 U.S. at 690-91; *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013).  Counsel must, at minimum, interview potential witnesses and make an independent investigation of the facts and circumstances of the case.  *Kately*, 704 F.3d at 361.  But in assessing the reasonableness of counsel's investigation, a heavy measure of deference is applied to counsel's judgments. *Strickland*, 466 U.S. at 691.  This wide latitude given to trial counsel includes the discretion to determine how best to utilize limited investigative resources available.  *Richter*, 562 U.S. at 107 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.").

Here, trial counsel's affidavit explained that neither Petitioner nor his girlfriend could provide an alibi of his location at the time of the murder, and the jury rejected his assertion that he was dropped off before the murder occurred.  Petitioner has not pointed to any evidence establishing that he owned a second cell phone that could provide an alibi, much less rebutted counsel's assertions that no such alibi was forthcoming from either Petitioner or his girlfriend. Even if Petitioner did own another cell phone, he fails to explain how such evidence would have altered the outcome of his trial, particularly given the fact that testimony linked Petitioner to the cell phone located at the crime scene and placed Petitioner at the scene of the crime.  In other words, Petitioner has not pointed to any exculpatory evidence that trial counsel could have uncovered with additional investigation or proven that an undiscovered witness would have testified in his favor.  *Gregory v. Thaler*, 601 F.3d 347, 353 (5th Cir. 2010).  As a result, Petitioner has not shown counsel's performance was deficient or that the state court's denial of this claim was an unreasonable application of *Strickland*.

    4.    <u>Failure to Object</u>

In a related claim, Petitioner faults counsel for failing to object to misleading and prejudicial evidence linking him to the cell phone that was placed in the vicinity of the crime scene at the time of the murder.  According to Petitioner, the State, through the testimony of law enforcement officers, repeatedly associated this cell phone with Petitioner despite the fact that it did not belong to him, but rather his girlfriend's mother.  Despite knowing this, counsel refused to object, allowing prejudicial evidence to go unchallenged.

Like the previous allegations, Petitioner raised this claim during his state habeas proceedings.  In response, trial counsel submitted an affidavit wherein he explained his reasons for not objecting:

> The phone number in question was linked to [Petitioner] by testimony of his girlfriend that testified that the number belonged to a telephone that [Petitioner] had access to and used frequently. The same phone number was used via cell phone tower testimony showing the phone was in the vicinity of the murder. Even if the cell phone according to [Petitioner] was not linked to him, the outcome would not have changed in my opinion because of the testimony of his co-defendant (R. Woodard), his girlfriend, [a] witness that [Petitioner] confessed to being present at the murder while in the Bexar County Jail, and letters he wrote to his girlfriend implicating him in the murder.

(ECF No. 12-50 at 39). The state habeas trial court found trial counsel's affidavit to be truthful and credible and concluded that Petitioner failed to establish counsel was ineffective under *Strickland*. *Id*. at 43-48. These findings and conclusions were then adopted by the Texas Court of Criminal Appeals when it denied Petitioner's state habeas application. (ECF No. 12-52).

Petitioner again fails to show that the state court's ruling was contrary to or involved an unreasonable application of *Strickland*. Trial counsel generally have broad discretion when it comes to deciding how best to proceed strategically, and such choices, made after a thorough investigation of the law and facts relevant to plausible options, are virtually unchallengeable. *Strickland*, 466 U.S. at 673; *Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir. 2015) (noting the Supreme Court has emphasized counsel has "wide latitude in deciding how best to represent a client."). Moreover, counsel's performance cannot be considered deficient or prejudicial if counsel fails to raise a non-meritorious argument. *See Miller v. Thaler*, 714 F.3d 897, 904 n.6 (5th Cir. 2013) (counsel is not required to make futile motions or objections); *Roberts v. Thaler*, 681 F.3d 597, 612 (5th Cir. 2012) ("the failure to lodge futile objections does not qualify as ineffective assistance").

Trial counsel's affidavit explained that he did object to any testimony linking Petitioner to the cell phone located near the crime scene because such an objection was not supported by the evidence and, even if it was, would not have made a difference at Petitioner's trial due to the overwhelming evidence presented by the State. Other than baldly stating that the cell phone did

not belong to him—a statement that is irrelevant given Petitioner's access to the phone—Petitioner has not shown that counsel's assessment was incorrect, much less demonstrated that state court's ruling on trial counsel's strategy "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Relief is therefore unwarranted.

  5. <u>Mitigating Evidence</u>

  Petitioner next contends that trial counsel was ineffective because he "failed to present any mitigating evidence." (ECF No. 1 at 7). Other than this lone sentence, however, Petitioner provides no argument or authority to support this assertion or even specify what mitigating evidence counsel should have presented at trial. Again, under Rule 2(c) of the Rules Governing Section 2254 Cases, a petitioner is required to plead facts in support of his claims. Conclusory allegations do not state a claim for federal habeas corpus relief and are subject to summary dismissal. *Ross*, 694 F.2d at 1012 (holding "mere conclusory allegations do not raise a constitutional issue in a habeas proceeding"); *Koch*, 907 F.2d at 530 (same). Thus, habeas relief is unavailable because the claim is wholly conclusory. *Demik*, 489 F.3d at 646 ("[C]onclusory allegations are insufficient to raise cognizable claims of ineffective assistance of counsel.").

  Furthermore, Petitioner has not rebutted the state habeas court's implied factual finding that counsel's investigation was adequate with clear and convincing evidence. In fact, Petitioner has not alleged with any specificity what further investigation would have revealed or how it would have altered the outcome of the trial. *Druery v. Thaler*, 647 F.3d 535, 541 (5th Cir. 2011). Nor has Petitioner named any witness counsel allegedly failed to contact, demonstrated that the witness was available to testify, or shown how the witness's proposed testimony would have been favorable to the defense. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). As a

result, Petitioner has not shown counsel's performance was deficient or prejudicial, much less that the state court's denial of this claim was an unreasonable application of *Strickland*.

6.    <u>Client Files</u>

Lastly, in a single sentence, Petitioner vaguely asserts that trial counsel failed to provide attorney/client files and documents necessary for preparing an appeal to challenge a factually incorrect warrant.  Petitioner's allegation is conclusory because he provides no argument or authority to support this bare assertion.  Regardless, Petitioner did not raise this allegation on direct appeal or during his state habeas proceedings.  Because it is being presented for the first time in this federal habeas proceeding, Petitioner's allegation is unexhausted and procedurally barred from federal habeas review.

Before seeking review in federal court, a habeas corpus petitioner must first present his claims in state court and exhaust all state court remedies through proper adjudication on the merits.  *See* 28 U.S.C. § 2254(b)(1)(A) (stating that habeas corpus relief may not be granted "unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State.").  The exhaustion requirement is satisfied if the substance of the federal habeas claim was presented to the highest state court in a procedurally proper manner.  *Baldwin v. Reese*, 541 U.S. 27, 29-32 (2004); *Moore v. Cain*, 298 F.3d 361, 364 (5th Cir. 2002).  In Texas, the highest state court for criminal matters is the Texas Court of Criminal Appeals, and a prisoner must present the substance of his claims to that court in either a petition for discretionary review or an application for writ of habeas corpus under Texas Code of Criminal Procedure Article 11.07. *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998); *Bautista v. McCotter,* 793 F.2d 109, 110 (5th Cir. 1986).

As the record demonstrates, Petitioner failed to exhaust his state court remedies with regard to the instant allegation. In addition to being unexhausted, however, Petitioner's claim is also procedurally defaulted. "A procedural default . . . occurs when a prisoner fails to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997) (citation and internal quotation marks omitted).

Here, should the Court now require Petitioner to return to state court to satisfy the exhaustion requirement, the Texas Court of Criminal Appeals would find the claim procedurally barred under the abuse of the writ doctrine found in Article 11.07 § 4 of the Texas Code of Criminal Procedure. Because Texas would likely bar another habeas corpus application by Petitioner, he has committed a procedural default that is sufficient to bar federal habeas corpus review. *See, e.g., Bagwell v. Dretke*, 372 F.3d 748, 755-56 (5th Cir. 2004) (holding a petitioner procedurally defaulted by failing to "fairly present" a claim to the state courts in his state habeas corpus application); *Smith v. Cockrell*, 311 F.3d 661, 684 (5th Cir. 2002) (holding unexhausted claims were procedurally barred); *Jones v. Johnson*, 171 F.3d 270, 276-77 (5th Cir. 1999) (same).

Consequently, Petitioner is precluded from federal habeas review of the instant claim unless he can show cause for the default and resulting prejudice, or demonstrate that the Court's failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991); *Busby v. Dretke,* 359 F.3d 708, 718 (5th Cir. 2004). He does neither. Thus, precedent compels the denial of the claim as procedurally defaulted.

**IV.  Certificate of Appealability**

The Court must now determine whether to issue a certificate of appealability (COA).  *See* Rule 11(a) of the Rules Governing § 2254 Proceedings;  *Miller–El v. Cockrell,* 537 U.S. 322, 335-36 (2003) (citing 28 U.S.C. § 2253(c)(1)).  A COA may issue only if a petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  If a district court rejects a petitioner's constitutional claims on the merits, the petitioner must demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel,* 529 U.S. 473, 484 (2000).  This requires a petitioner to show "that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Miller–El,* 537 U.S. at 336 (citation omitted).

A district court may deny a COA *sua sponte* without requiring further briefing or argument.  *See Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir. 2000).  For the reasons set forth above, the Court concludes that jurists of reason would not debate the conclusion that Petitioner was not entitled to federal habeas relief.  As such, a COA will not issue.

**V.  Conclusion and Order**

After careful consideration, the Court concludes that Petitioner failed to establish that the state court's rejection of the above claims on the merits during either his direct appeal or state habeas proceedings was either (1) contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) based on an unreasonable determination of the facts in light of the evidence presented during his state trial, appellate, and habeas corpus proceedings.  The Court also concludes that one of Petitioner's

IATC claims—Claim 3(e)—is unexhausted and procedurally barred from federal habeas review. As a result, Petitioner's federal habeas corpus petition does not warrant relief.

Accordingly, based on the foregoing reasons, **IT IS HEREBY ORDERED** that:

1.      Federal habeas corpus relief is **DENIED** and Petitioner Joseph Alvarado, III's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 1) is **DISMISSED WITH PREJUDICE**;

2.      No Certificate of Appealability shall issue in this case; and

3.      All remaining motions, if any, are **DENIED**, and this case is now **CLOSED**.

It is so **ORDERED**.

**SIGNED this the 23rd day of January, 2025.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**